UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS ALBERTO DE LA GARZA,<br><br>Petitioner,<br><br>v.<br><br>SERGIO ALBARRAN, et al.,<br><br>Respondents. | Case No. 25-cv-10305-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Re: Dkt. No. 8 |

Petitioner Carlos Alberto De La Garza moves the Court for a temporary restraining order ("TRO") that would, among other things, require his immediate release from ongoing detention by agents of Immigration and Customs Enforcement ("ICE") and prohibit ICE from re-arresting him without notice and a pre-detention bond hearing. Given the time-sensitive nature of the TRO, the Court set an expedited briefing schedule and finds that this matter is appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). Having carefully reviewed the parties' arguments in detail, the Court **GRANTS IN PART** and **DENIES IN PART** the TRO. Dkt. No. 8.

**I. BACKGROUND**

**A. Factual Background**

According to the record before the Court, Petitioner was born in Mexico and first came to the United States in the early 1990s. Dkt. No. 1 at ¶ 30. He was previously deported in 1994 and 1996, and returned to the United States in 1996. *Id.* Petitioner also has three misdemeanor criminal convictions from the early 1990s for violations of (1) California Vehicle Code § 23152(a) (driving under the influence); (2) California Penal Code § 484(a) (petty theft); and (3) California Vehicle Code § 14601.5 (driving on a suspended license). *See id.* at ¶ 30. Petitioner's son, Carlos

Moreno, was born in 1996 in Oakland, California. *See id.* at ¶ 31. Petitioner and Carlos's mother, Adriana Moreno, a United States citizen, married in 2000 and bought a home together in 2001. *Id.* at ¶¶ 32–33. In 2001, Petitioner applied to adjust his immigration status to lawful permanent resident. *See id.* at ¶ 34. He fully disclosed his criminal and deportation history at that time. *Id.* In November 2004, Petitioner's application for adjustment of status was granted, and he became a lawful permanent resident. *Id.* at ¶ 35.

In May 2007, Petitioner was convicted of violations of California Health and Safety Code § 11379(a) (transportation of a controlled substance) and California Penal Code § 182(a)(1) (conspiracy). *See id.* at ¶ 36. However, these convictions were later vacated in May 2024, and the district attorney's office dismissed all charges. *Id.* Nevertheless, Petitioner lost his permanent residence status as a result of the (now overturned) convictions. *See id.* at ¶ 37. Based on these convictions, ICE initiated removal proceedings in 2008. *Id.* On June 24, 2008, an Immigration Judge found Petitioner removable from the United States and granted him voluntary departure in lieu of a removal order. *Id.* Petitioner voluntarily departed to Mexico on June 24, 2008. *Id.* at ¶ 38. Two days later, Petitioner returned to the United States, presenting his permanent resident card at the port of entry. *Id.* at ¶ 39. Petitioner states that he believed his permanent resident card, which was still facially valid, permitted his return to the United States. *Id.* According to Petitioner, he has not departed the United States since his inspection and admission on June 26, 2008.[1] *Id.* at ¶ 40.

In the intervening years, Petitioner has been a caretaker for his son, who was born with cerebral palsy. *See id.* at ¶¶ 31, 41–43. Petitioner suffered an injury in 2012, which limited his ability to help with his son and around the house. *Id.* at ¶ 44. According to Petitioner, this led to a mental health crisis. *Id.* In April 2014, someone called the police because Petitioner was acting erratically, and Petitioner was arrested for assaulting the police officer who arrived to help. *Id.*

---

[1] The Court notes that according to Respondents, Petitioner illegally entered the United States on November 18, 2015. *See* Dkt. No. 10-1 ("Jerome Decl.") at ¶ 12; Dkt. No. 10-2. Ex. 1 at 4. Respondents state that Petitioner informed ICE of this date during their interview with him following his detention on December 1, 2025. *Id.* The Court need not address this discrepancy, however, since even under Respondents' version of events, Petitioner has been continuously present in the United States for over a decade.

2

1  Petitioner pled no contest to a felony violation of Cal. Penal Code § 245(c) (assault on an officer)
2  in Alameda County Superior Court, and he was sentenced to 5 years of probation. *Id.* at ¶ 47. He
3  completed his probation in January 2020. *Id.* at ¶ 48. According to a Freedom of Information Act
4  response, in 2017 ICE requested records relating to Petitioner's arrest and conviction, and the
5  court records are part of his "A file." *Id.* at ¶ 50.

6  In December 2020, Petitioner's wife passed away from cancer. *Id.* at ¶ 51. Petitioner thus
7  became a single parent and caretaker for his adult son, who still required full-time care. *See id.* at
8  ¶¶ 52–55.

9  In November 2024, Petitioner again applied for permanent residence. *See id.* at ¶ 56.
10 Petitioner fully disclosed his immigration and criminal history. *See id.* at ¶ 58. He filed an
11 application for a waiver of inadmissibility for his 2014 conviction based on the hardship that his
12 son would suffer without his father. *Id.* at ¶ 56. Petitioner completed his biometrics processing in
13 December 2024 and was issued employment authorization documents in January 2025. *Id.* at
14 ¶¶ 59, 61.

15 Following several hospitals stays, Petitioner's son passed away in August 2025. *See id.* at
16 ¶¶ 61–65. Petitioner's immigration applications were still pending at the time. *See id.* at ¶ 67.
17 Petitioner asked USCIS to approve his applications, pursuant to 8 U.S.C. § 1154(l).[2] *Id.* USCIS
18 scheduled Petitioner to appear for an interview on December 1, 2025. *See id.* at ¶ 70. Petitioner
19 appeared at the USCIS San Francisco Field Office and answered all questions regarding his
20 application. *Id.* at ¶¶ 70–71. Following the interview, the USCIS Acting Field Office Director
21 walked into the interview room with two ICE agents and detained Petitioner. *Id.* at ¶ 71. At least
22 according to Petitioner's counsel, Petitioner was being detained at the time at 630 Sansome Street
23 in San Francisco, California.[3] *Id.* at ¶ 73. Respondents state that on December 1, 2025, ICE

---

[2] Section 1154(l) states: "An alien . . . who resided in the United States at the time of the death of the qualifying relative and who continues to reside in the United States shall have [an I-130] petition . . . , or an application for adjustment of status to that of a person admitted for lawful permanent residence based upon the family relationship . . . , and any related applications, adjudicated notwithstanding the death of the qualifying relative, unless the Secretary of Homeland Security determines, in the unreviewable discretion of the Secretary, that approval would not be in the public interest."

[3] Respondents represent that after Petitioner was processed, he was transported to a facility in

1  issued a Notice to Appear ("NTA"), charging Petitioner with removability as "[a]n alien present in
2  the United States without being admitted or paroled," under 8 U.S.C. § 1182(a)(6)(A)(i). *See* Dkt.
3  No. 10 at 3; Jermone Decl. at ¶ 12.

### B. Procedural Background

Petitioner filed a habeas petition and an ex parte motion for a TRO on December 1, 2025, following his detention. Dkt. Nos. 1, 8. That same day, counsel provided notice by email of the motion to Pamela Johann, Chief of the Civil Division of the U.S. Attorney's Office for the Northern District of California, and the Court set an expedited briefing schedule. *See* Dkt. No. 9.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 65, a temporary restraining order may enjoin conduct pending a hearing on a preliminary injunction. *See* Fed. R. Civ. P. 65(b). The standard for issuing a temporary restraining order and issuing a preliminary injunction are substantially identical. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839, n.7 (9th Cir. 2001). Such an order may be issued only where the plaintiff has established: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to plaintiff in the absence of preliminary relief; (3) the balance of equities tips in plaintiff's favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Under the Ninth Circuit's sliding scale approach, a plaintiff may alternatively establish that there are "serious questions going to the merits" if "a hardship balance [also] tips sharply towards the plaintiff," and the other two *Winter* factors are satisfied. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

## III. DISCUSSION

Respondents argue that Petitioner's detention is permissible, and the TRO should be denied, because Petitioner is subject to mandatory detention under 8 U.S.C. § 1225(b)(2). *See*

---

Stockton, California. *See* Dkt. No. 10-2, Ex. 1 at 38. Nevertheless, it is well-established that "when the Government moves a habeas petitioner after [he] properly files a petition naming [his] immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." *See Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004).

*generally* Dkt. No. 10.  As such, the government asserts, Petitioner is not eligible for a bond hearing and no due process violation has occurred.  *Id.*  The government has made this same argument in other cases before this Court and in this district, and the Court remains unpersuaded.

### A. Likelihood of Success on the Merits

Despite the government's assertion that Petitioner's detention was mandatory, the Court finds that Petitioner has shown that, at a minimum, there are "serious questions going to the merits" of his procedural due process claim.

Respondents' position to the contrary turns on its new and expansive interpretation of § 1225(b)(2)(A).  *See* Dkt. No. 10.  Section 1225(b)(2), states that, subject to certain statutory exceptions not relevant here, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [removal proceedings] of this title."  8 U.S.C. § 1225(b)(2).  Respondents contend that Petitioner is properly classified as an "applicant for admission . . . seeking admission" under § 1225(b)(2)(A), despite having lived in the United States for decades.  *See* Dkt. No. 10 at 9–19.  As Respondents succinctly state, "an alien who enters the country without inspection and admission is and remains an applicant for admission, regardless of the duration of the alien's presence in the United States or distance traveled from the border."  *Id.* at 10.  And according to Respondents, any "applicant for admission" is necessarily also "seeking admission."  *See id.* at 11–12.  Such an interpretation would, in essence, allow the government to detain without a hearing virtually any noncitizen not lawfully admitted to the United States.

But like other courts in this district, the Court rejects this interpretation as contrary to the relevant statutory language and overall statutory framework.  *See, e.g.*, *Salcedo Aceros v. Kaiser*, No. 25-CV-06924-EMC (EMC), 2025 WL 2637503, at *8–12 (N.D. Cal. Sept. 12, 2025) (collecting cases); *Diaz v. Albarran*, No. 3:25-CV-09837-JSC, 2025 WL 3214972, at *2 (N.D. Cal. Nov. 18, 2025) (same).  The Court agrees with and adopts the reasoning of these cases here.  "Seeking admission" does not refer to individuals who have been living in the country for years.  Rather, the better interpretation is that noncitizens arriving and seeking admission are subject to

mandatory detention under § 1225, whereas noncitizens who are already present and living in the United States are subject to the detention scheme under § 1226.

Setting aside Respondents' statutory argument, they offer little else in opposition to Petitioner's motion for a TRO. *See generally* Dkt. No. 10. Yet the Due Process Clause of the Fifth Amendment protects all persons within the United States from being "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical constraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "Even individuals who face significant constraints on their liberty or over whose liberty the government wields significant discretion retain a protected interest in their liberty." *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025) (collecting cases). The Due Process Clause applies to noncitizens within the United States "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693.

In determining what process is due, the Court applies the test under *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Orozco Acosta v. Bondi*, No. 25-CV-09601-HSG, 2025 WL 3229097, at *2–4 (N.D. Cal. Nov. 19, 2025) (rejecting same government arguments that *Mathews* should not apply in this context); *accord Pinchi*, 792 F. Supp. 3d at 1031 (collecting cases). And in doing so, the Court finds that Petitioner here has a substantial liberty interest in remaining out of custody, the risk of erroneous deprivation is high, and the government's countervailing interests are low.

Petitioner has a substantial liberty interest in remaining out of custody on bond, which would enable him to "contribute to his family and community" as he has done for the past several decades, while continuing to process the recent death of his son. *See* Dkt. No. 8 at 14, 17; *see also Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

The risk of erroneous deprivation here is also high. Civil immigration detention is generally permissible only to protect against danger to the community or to prevent a flight risk. *See Zadvydas*, 533 U.S. at 690; *see also* 8 U.S.C. § 1226(a). Petitioner's detention here is not likely to serve either purpose. Although Petitioner has some prior criminal convictions, the most recent was over a decade ago, and appears to have been driven by a mental health crisis. *See* Dkt.

No. 1 at ¶¶ 31, 41–43. Petitioner was not sentenced to any custodial time as part of this conviction, and he successfully completed his probation. *Id.* Moreover, the record indicates that USCIS was aware of Petitioner's past criminal history, but continued to process his immigration application, including issuing him employment authorization documents earlier this year, and never sought to detain him previously. *See id.* at ¶¶ 56, 58–59, 61.

Respondents have not shown any persuasive countervailing interest in continuing to detain Petitioner without a hearing at this stage. Petitioner is in full removal proceedings, and has demonstrated compliance with reporting requirements in the past, including appearing for his December 1 interview with USCIS. Moreover, detention for its own sake is not a legitimate governmental interest. *See Pinchi*, 792 F. Supp. 3d at 1036 ("Detention for its own sake, to meet an administrative quota, or because the government has not yet established constitutionally required pre-detention procedures is not a legitimate government interest.").

### B.     Irreparable Harm

Petitioner has also demonstrated a likelihood of irreparable injury in the absence of temporary relief. "Deprivation of physical liberty by detention constitutes irreparable harm." *Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018); *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." (quotation omitted)). When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005). Petitioner was detained a few days ago without any pre-detention hearing, and remains in ICE custody.

### C.     Balance of Equities and Public Interest

The final two *Winter* factors, the balance of the equities and public interest, also weigh heavily in favor of granting temporary relief. "[T]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Jorge M. F. v. Wilkinson*, No. 21-cv-01434-JST, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021) (cleaned up); *see Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the

7

violation of a party's constitutional rights." (quotation omitted)); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). The government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigration & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).

As courts in this district have repeatedly concluded in similar circumstances, the potential harm to Petitioner is significant: he faces immediate and potentially prolonged ICE detention.[4] Meanwhile, the potential harm to the government is minimal. The only potential injury Respondents face is a short delay in detaining Petitioner if a neutral decisionmaker ultimately finds by a preponderance of the evidence that his detention is necessary to prevent danger to the community or that he presents a flight risk. *See Orozco Acosta*, 2025 WL 3229097, at *5 (collecting cases).

The Court further finds that a TRO immediately releasing Petitioner is appropriate to return him to the status quo. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018). The status quo refers to "the last uncontested status which preceded the pending controversy." *Doe v. Noem*, 778 F. Supp. 3d 1151, 1166 (W.D. Wash. 2025) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)). That is the moment prior to Petitioner's likely illegal detention. *See Kuzmenko v. Phillips*, No. 25-cv-00663, 2025 WL 779743, at *2 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining order requiring immediate release of the petitioner back to home confinement from custody, as a restoration of the status quo). Because Petitioner satisfies all requirements for temporary injunctive relief and such relief is necessary to restore the status quo, the motion for a TRO enjoining Respondents from continuing to detain Petitioner is **GRANTED** as detailed below.

---

[4] The Court further notes its concerns about the possible duration of Petitioner's detention given the recent mass terminations of immigration judges in the Bay Area. *See, e.g.*, Lisa Fernandez and Jana Katsuyama, *Trump administration fires at least 15 immigration judges in Bay Area* (Dec. 2, 2025), KTVU Fox 2, available at https://www.ktvu.com/news/trump-administration-fires-least-15-immigration-judges-bay-area (last visited December 4, 2025). Respondents do not even attempt to provide a timeline for Petitioner's removal proceedings.

### D. Pre-Detention Hearing

The Court notes that in Petitioner's motion for a TRO he also requests that he be released and receive a pre-detention hearing "before this Court" rather than before an immigration judge. *See* Dkt. No. 8 at 18, 22–23. Petitioner attempts to paint this request as routine, but offers only a handful of non-binding cases about the Court's general authority in habeas proceedings. *See Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (finding that the court could grant bail to habeas petitioners in unusual cases where "the habeas petition raise[s] substantial claims and that extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective"). The Ninth Circuit, however, has explicitly declined to decide whether district courts have such inherent power. *See In re Roe*, 257 F.3d 1077, 1080 (9th Cir. 2001) (sidestepping issue in prisoner context).

Moreover, empowering the district court to hold the detention hearing, rather than an immigration judge, under these circumstances would also likely run counter to § 1226(e), which states explicitly that "[n]o court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole." 8 U.S.C.A. § 1226(e). Thus, this Court would not have the authority to review the immigration judge's determination whether Petitioner was a danger to the community or flight risk, but Petitioner would have the Court wrest this decision from the immigration judge and make the determination itself. The Court declines the unsupported invitation to do so here and **DENIES** the motion for a TRO to the extent Petitioner asks the Court to hold any pre-detention hearing itself.

### E. Security

Finally, the Court exercises its discretion under Rule 65(c) to dispense with the filing of bond. "[T]here is no realistic likelihood of harm to the [Respondents] from enjoining [their] conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Therefore, no security is needed to ensure that Respondents will be reimbursed for "costs and damages sustained by . . . hav[ing] been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

//

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Petitioner's Motion for Temporary Restraining Order is **GRANTED IN PART** to preserve the status quo pending further briefing and a hearing on this matter. Dkt. No. 8. Respondents are **ORDERED** to immediately release Petitioner from Respondents' custody and are **ENJOINED AND RESTRAINED** from re-detaining Petitioner without notice and a pre-deprivation hearing before a neutral decisionmaker, and from removing Petitioner from the United States. Respondents shall provide a status report confirming Petitioner's release by 12:00 p.m. on December 5, 2025. The Court **DENIES** the motion, however, to the extent Petitioner asks the Court to hold any pre-detention hearing itself.

This Order shall remain in effect through Monday, December 15, 2025. Respondents are further **ORDERED TO SHOW CAUSE** why a preliminary injunction should not issue. The Court **SETS** an in-person hearing on the motion to show cause for Thursday, December 11, 2025, at 2:00 p.m. in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA. The Court assumes that whether a preliminary injunction should issue may be decided on the briefing already submitted, but if the parties are of a different view, they should meet and confer and propose a further briefing schedule that would be fully complete by 5:00 p.m. on Tuesday, December 9.

**IT IS SO ORDERED.**

Dated: 12/4/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge